# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JEFF GERTH,**<br><br>     **6141 31ST PLACE, N.W.**<br>     **WASHINGTON, DC 20015**<br><br>          **Plaintiff,**<br><br>     **vs.**<br><br>**UNITED STATES DEPARTMENT OF**<br>**DEFENSE,**<br><br>          **Defendant.** | **Civil Action No. 08-_____** |

## COMPLAINT

Plaintiff Jeff Gerth, by and through undersigned counsel, alleges as follows:

### INTRODUCTION

1.     This is an action under the Freedom of Information Act ("FOIA" or "the Act"), 5 U.S.C. § 552, *et seq.*, brought by an investigative reporter to compel access to a government report that assessed the state of the Iraqi oil industry during the run-up to the war in Iraq ("the EIPG report").

2.     On information and belief, this report was prepared, at least in part, by a subsidiary of the Halliburton Company working under the auspices of the United States Department of Defense ("DOD" or "defendant"), and its release would shed light on issues of enormous public importance, including the adequacy of the government's pre-war planning and the extent to which considerations about the Iraq oil industry affected military strategy and

administration decision-making in connection with the war. The EIPG report is sought by plaintiff in connection with his continuing reporting on these matters.

3.     Significant public interest exists in understanding the steps taken and the decisions made by the United States government in planning for the financing and conduct of a war that has now been ongoing for five years. Plaintiff seeks judicial review and declaratory, injunctive and other relief to enforce his statutory right to inspect the EIPG report.

## THE PARTIES

4.     Plaintiff Jeff Gerth is a senior investigative reporter for Pro Publica, an independent, non-profit enterprise committed to producing investigative journalism in the public interest. Mr. Gerth was an investigative reporter at *The New York Times* from 1976 through 2005, during which time he covered issues ranging from Al Qaeda to Enron, from Whitewater to Chinese technology transfers. He also has served as a visiting professor at Princeton University and is the co-author of the book *Her Way: The Hopes and Ambitions of Hillary Rodham Clinton*. Mr. Gerth's past reporting has twice been honored with the Pulitzer Prize.

5.     Defendant Department of Defense is a department within the executive branch of the United States government. Defendant is an agency of the United States within the meaning of 5 U.S.C. § 552(f)(1).

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action and personal jurisdiction over defendant pursuant to 5 U.S.C. §§ 552(a)(4)(B) and 552(a)(6)(E)(iii). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-06.

7.     Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B).

**FACTS**

**The Controversy Underlying Plaintiff's FOIA Request**

8.     In September 2003, plaintiff conducted a telephone interview with a Pentagon official who served on the DOD's Energy Infrastructure Planning Group. That interview, conducted on condition that Mr. Gerth not identify the official by name in his reporting, was arranged by and through DOD's public affairs office. A representative of that office, Major General Paul Swiergosz, listened in on the telephonic interview and advised plaintiff that the interview was being recorded by DOD.

9.     Mr. Gerth does not have a security clearance. Nevertheless, during the interview arranged by DOD, the Pentagon official freely discussed with Mr. Gerth the substance of the theretofore-undisclosed EIPG report. Neither the Pentagon official being interviewed nor Major General Swiergosz gave any indication during the call that the information from the EIPG report provided to Mr. Gerth could not legally be shared with him and used in his reporting.

10.     On information and belief, the EIPG report is between 500 and 2,000 pages in length and was prepared in 2002 under the direction of Michael H. Mobbs, Special Advisor to Douglas J. Feith, then Under Secretary of Defense for Policy. On information and belief, the report was drafted, at least in part, by the KBR division of the Halliburton Company, and the Central Intelligence Agency ("CIA") contributed to the contents of the report.

11.     Following the September 2003 interview about the report, Mr. Gerth and DOD officials exchanged emails over unsecured, non-classified channels referencing the contents of the interview and discussing aspects of the EIPG report.

12.     Around this time, Mr. Gerth also discussed the EIPG report with Philip Carroll, a former Shell Oil executive who acted as an adviser to the EIPG.

3

13.     Based upon the information disclosed by DOD and his own reporting, Mr. Gerth wrote a news article revealing the existence of the Energy Infrastructure Planning Group that was published in *The New York Times* on October 5, 2003.  That article explained, *inter alia*, that the report prepared by the EIPG had provided a much bleaker assessment of the Iraqi oil industry and its ability to fund post-war reconstruction efforts than the assessment disseminated publicly by administration officials in advance of the U.S. invasion.  (A true and correct copy of the Gerth article about the EIPG report is attached hereto as Exhibit A.)

14.     To date, plaintiff has been able to report only anecdotally on the information contained in the EIPG report, which is unquestionably of great interest to the public.

### Plaintiff's Efforts to Obtain the Report

15.     On October 3, 2003, Mr. Gerth submitted to DOD a narrow, specific and particularized FOIA request for a copy of the EIPG report.  (A true and correct copy of the request is attached hereto as Exhibit B.)

16.     More than a year later, plaintiff's FOIA request was flatly denied by DOD, which invoked 5 U.S.C. § 552(b)(1), FOIA's exemption for "national defense" and "foreign policy" secrets.  (A true and correct copy of the Nov. 10, 2004 denial letter is attached hereto as Exhibit C.)  According to the denial letter, the determination to withhold the EIPG report was made by Mr. Mobbs, who concluded that the report was "properly classified by Executive Order 12958, as amended, Section 1.5(c)[,] which pertains to intelligence sources and methods."

17.     Under 5 U.S.C. § 552(b), DOD is required to produce "reasonably segregable" portions of the EIPG report that are not subject to this FOIA exemption. Notwithstanding this statutory obligation, and despite its own prior disclosures from the report to Mr. Gerth, DOD refused to produce even a single word from the hundreds of pages of the report.

18.    On November 16, 2004, Mr. Gerth timely filed an administrative appeal from the denial of his FOIA request and sought expedited processing of the appeal by DOD. (A true and correct copy of the appeal petition is attached hereto as Exhibit D.)

19.    One month later, DOD granted "expedited processing" and "moved [the] appeal ahead of other FOIA appeals, other than those we have also granted expedited processing." (A true and correct copy of the interim appeal response letter, granting expedited processing, is attached hereto as Exhibit E.)

20.    Notwithstanding the promise of expedited consideration, and despite Mr. Gerth's repeated, persistent communications with DOD seeking to move the process along, his appeal remains "pending" to this day, more than three years later.

21.    On information and belief, Mr. Mobbs, upon consideration of plaintiff's appeal, determined that portions of the EIPG report are indeed subject to disclosure under FOIA, and at least two different action officers, David Maier and Stephen Fisher, have been assigned to secure the proper reviews and approvals for release of sections from the report. Nonetheless, no portion of the report has yet been released and DOD has issued no formal determination on the still-pending administrative appeal.

22.    Repeated requests by Mr. Gerth for release of the EIPG report and/or for a ruling on his appeal have been met by either extended silence or promises of imminent action that are never fulfilled. Most recently, by letter dated February 22, 2008, counsel for plaintiff implored DOD for a determination of the "expedited appeal" that has been pending since November 16, 2004. DOD has provided no response to that letter.

23.    More than twenty days have passed, without response, since Mr. Gerth submitted his administrative appeal to DOD.

24. Plaintiff has exhausted his administrative remedies.

## FIRST CAUSE OF ACTION
### (Violation of FOIA for failure to make records available)

25. Plaintiff repeats, realleges, and incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

26. Defendant's failure to make promptly available and to release the EIPG report requested by plaintiff violates FOIA, 5 U.S.C. § 552(a)(3)(A).

## SECOND CAUSE OF ACTION
### (Violation of FOIA for constructively failing to expedite plaintiff's appeal)

27. Plaintiff repeats, realleges, and incorporates the allegations in the foregoing paragraphs as though fully set forth herein.

28. Defendant's failure to expedite the processing of plaintiff's appeal (despite its statements purporting to "grant" plaintiff's request to expedite) violates FOIA, 5 U.S.C. § 552(a)(6)(E), and defendant's own regulations promulgated thereunder.

## RELIEF REQUESTED

**WHEREFORE,** plaintiff respectfully prays that this Court:

a.   Declare that the EIPG report must be disclosed by defendant in its entirety or with properly narrow redactions;

b.   Enjoin Defendant immediately and expeditiously to provide plaintiff with a copy of the EIPG report in its entirety or as properly redacted;

c.   Award plaintiff the costs of this proceeding, including reasonable attorneys' fees; and

d.   Grant such other and further relief as the Court deems just and proper.

Dated:  April 8, 2008

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ LLP

By: _____

David A. Schulz, D.C. Bar No. 459917
John B. O'Keefe, D.C. Bar No. 974892

1050 Seventeenth Street, N.W., Suite 800
Washington, D.C.  20036-5514
Telephone: (202) 508-1100
Facsimile: (202) 861-9888
Email: jokeefe@lskslaw.com

# Exhibit A

**The New York Times**
nytimes.com

October 5, 2003

# THE STRUGGLE FOR IRAQ: RECONSTRUCTION; Report Offered Bleak Outlook About Iraq Oil

By JEFF GERTH

The Bush administration's optimistic statements earlier this year that Iraq's oil wealth, not American taxpayers, would cover most of the cost of rebuilding Iraq were at odds with a bleaker assessment of a government task force secretly established last fall to study Iraq's oil industry, according to public records and government officials.

The task force, which was based at the Pentagon as part of the planning for the war, produced a book-length report that described the Iraqi oil industry as so badly damaged by a decade of trade embargoes that its production capacity had fallen by more than 25 percent, panel members have said.

Despite those findings, Deputy Defense Secretary Paul D. Wolfowitz told Congress during the war that "we are dealing with a country that can really finance its own reconstruction, and relatively soon."

Moreover, Vice President Dick Cheney said in April, on the day Baghdad fell, that Iraq's oil production could hit 3 million barrels a day by the end of the year, even though the task force had determined that Iraq was generating less than 2.4 million barrels a day before the war.

Now, as the Bush administration requests $20.3 billion from Congress for reconstruction next year, the chief reasons cited for the high price tag are sabotage of oil equipment -- and the poor state of oil infrastructure already documented by the task force.

"The problem is this," L. Paul Bremer III, the top civilian administrator in Iraq, asserted at a Senate hearing two weeks ago: "The oil infrastructure was severely run down over the last 20 years, and partly because of sanctions over the last decade."

Similarly, Bush administration officials announced earlier this year that Iraq's oil revenues would be $20 billion to $30 billion a year, which added to the impression that the aftermath of the war would place a minimal burden on the United States. Mr. Bremer now estimates that Iraq's total oil revenues from the last half of 2003 to 2005 will amount to $35 billion, running at a rate of about $14 billion a year.

The administration now plays down the report's findings.

Senior administration officials said that Mr. Cheney, Mr. Wolfowitz and Donald H. Rumsfeld, the secretary of defense, were aware of the oil group's overall mission, but that they could not say whether they knew of its specific findings.

"I think when it is all said and done," said Lawrence Di Rita, the Pentagon's chief spokesman, "prewar estimates that may be borne out in fact are likelier to be more lucky than smart."

Mr. Di Rita added that earlier estimates and statements by Mr. Wolfowitz and others "oozed with uncertainty."

Iraq's Most Valuable Asset

In the months leading up to the war, administration officials said little in public about oil, partly because they were "encumbered by fear" that their actions would be seen as helping the American petroleum industry, said one administration adviser. But behind the scenes, officials were studying how to handle Iraq's most valuable asset.

It was evident from much of the information they received that Iraq's oil was not a ready resource for reconstruction.

One expert consulted by the government, Amy Myers Jaffe, who heads the energy program at the James A. Baker III Institute for Public Policy at Rice University in Houston, said her group concluded in a report last December that "oil revenues would not be enough and that the expenses of reconstruction would be huge."

In addition, United Nations reports dating back to the late 1990's documented the deterioration that occurred in Iraq's oil system as a result of trade embargoes, which curtailed Iraq's access to technology and equipment.

The administration's examination of the subject began last September when Douglas J. Feith, the under secretary of defense for policy, asked an adviser to oversee plans for Iraq's oil industry in the event of war, according to a Pentagon official involved in the project.

The result was the Energy Infrastructure Planning Group, whose existence has not been previously disclosed. It drew on the expertise of government specialists including the Central Intelligence Agency and retired senior energy executives. It planned how to secure the oil industry during the war and, afterward, restoring it to its prewar capacity.

The task force's job was not to make a direct assessment of how much money the oil industry could contribute to rebuilding Iraq. But determining Iraq's actual oil production capacity was important. First, it could help other administration officials gauge how much revenue might be generated for the reconstruction effort. Second, the administration was concerned that it did not want to be seen as profiting from invading an oil-rich nation and giving oil production levels a boost.

The task force concluded that although Iraq's stated production capacity was just over 3 million barrels per day, the system was only producing 2.1 million to 2.4 million barrels, panel members said.

"I think most people would agree that the 2.4 was a little high and the average for 2002 was 2.1," said a Pentagon official on the task force who spoke on the condition of anonymity. The "condition of the Iraqi oil infrastructure was not particularly good," the official said. "That would be evident to anybody who realized the country had been under U.N. sanctions for many years."

The United Nations produced reports on Iraq regularly from 1998 to 2001. The documents painted a picture of a troubled system and cited the need for improvements, some of which are now being proposed by Mr. Bremer, like the $125 million repair of the Qarmat Ali water plant in the south.

In April, when Vice President Cheney was asked about Iraq's oil during an appearance before newspaper editors, he cited higher numbers rather than the task force's more sober findings.

While noting that Iraq's oil fields were in "bad shape," Mr. Cheney said, "With some investment we ought to be able to get production back up on the order of 2.5, 3 million barrels a day, within, hopefully by the end of the year."

An aide to the vice president said recently that those estimates were "consistent with prewar capacity," but could not say whether Mr. Cheney was aware of the task force's different assessment.

An Optimistic Vision

The administration was also optimistic when it came to public estimates of Iraq's oil revenues.

Shortly after the war began in March, the administration's budget office provided Congress and reporters with a background paper on Iraq. It said that Iraq would "not require sustained aid" because of its abundant resources, including oil and natural gas.

On March 27, Mr. Wolfowitz, the deputy defense secretary, told the House Appropriations Committee that his "rough recollection" was that "The oil revenues of that country could bring between $50 billion and $100 billion over the course of the next two or three years."

Testifying in the Senate that same day, Mr. Rumsfeld emphasized that "when it comes to reconstruction, before we turn to the American taxpayers we will turn first to the resources of the Iraqi government." He noted that the war's costs were not knowable, but he also said an important source of money for reconstruction would flow after the United States worked "with the Iraqi interim authority that will be established to tap Iraq's oil revenues."

At the outset of the war, the administration had asked Congress for $62 billion for Iraq, which included $1.7 billion for reconstruction and $489 million for oil-related repairs.

In a televised interview in late April, Andrew S. Natsios, head of the United States Agency for International Development, the group overseeing Iraq's reconstruction, said that amount was "it for the U.S." He said any other reconstruction money would come from elsewhere, including other countries and future "Iraqi oil revenues," which he predicted at "$20 billion a year."

In an interview this week, Mr. Natsios said he had based those comments on "the discussion in the interagency process at the time," adding, "That's what the Office of Management and Budget was telling us."

Trent Duffy, a budget office spokesman, said this week that "the administration was very clear that the $1.7 billion in initial reconstruction was for the beginning stages and that it was necessary to get a better understanding of the fuller, comprehensive needs going forward."

Last week, appearing again before the Senate committee, Mr. Rumsfeld said, "I don't think I did misjudge" Iraq's oil capacity. According to current projections, he said, the country's oil revenues will grow to $12 billion next year from $2 billion this year; they should reach $19 billion in 2005 and $20 billion in 2006.

"So, their oil revenues will be contributing," Mr. Rumsfeld said.

Yet Mr. Bremer, in his remarks to legislators two weeks ago, said that for the next two years, whatever revenue was reaped from oil production would not exceed the cost of Iraq's day-to-day operating expenses. In 2005, he said, there would be a surplus of only $4 million to $5 million.

As for Mr. Cheney's projection in April that oil would produce as much as $20 billion a year, a Cheney aide said last week that "there was much more extensive damage due to looting and sabotage, so we're not going to get there when the vice president anticipated."

Reassessing Revenues

The public revenue estimates made in the spring were in line with the very top range of projections made by the

Pentagon task force.

According to the Pentagon official who served on the task force, its projections for yearly oil revenues were $25 billion to $30 billion "in the very best case, no sabotage and little or no battle damage," and about $16 billion in the "worse than best case."

The worst case was no revenue for a few years, if there was "major sabotage and some significant battle damage."

Last December the Baker Institute estimated that even if there was no war damage, "Iraq's total oil revenues would still only likely average around $10 billion to $12 billion annually."

Yet even after the war, some officials in Washington seemed to cling to an optimistic view of Iraq's oil production.

In July, Mr. Wolfowitz told a group of senators that production had reached "over a million barrels per day." Although Iraq was having electrical power problems, Mr. Wolfowitz said the oil was flowing "because we brought in portable generators to provide electricity" and planned to bring in more.

But Philip Carroll, a retired petroleum executive and the senior American oil adviser in Baghdad, said in an interview that Iraqi oil production "experienced a terrible month in July because electrical problems cut us back to half of what we should have produced." Those problems, including the need to import considerable fuel, he said, led him to arrange new generator leases in late July.

Mr. Carroll said that although gross production for the week of July 25 was a million barrels a day, 350,000 barrels had to be injected back into the ground, because of a lack of storage or distribution infrastructure.

An aide to Mr. Wolfowitz said he believed that the oil information came from a briefing and that Mr. Wolfowitz's testimony was "sober and nuanced."

Once the war ended, and United States officials gained access to Iraq's oil records, they got a more complete picture.

"When we actually got their production figures for 2002, we were able to make a distinction between productive capacity and what they were actually producing," said Gary Loew, an Army Corps of Engineers official, reducing their capacity figures by 20 to 25 percent.

That reduction roughly corresponded to the Pentagon task force's cuts before the war began.

Copyright 2008 The New York Times Company | Home | Privacy Policy | Search | Corrections | **XML** | Help | Contact Us |

# Exhibit B

**dfoisr@dfoisr.whs.mil, 01:01 PM 10/3/2003 -0400, Freedom of Information Act request from news**

To: dfoisr@dfoisr.whs.mil
From: Jeff Gerth <jegert@nytimes.com>
Subject: Freedom of Information Act request from news media
Cc:
Bcc:
Attached:


Oct. 3, 2003


Directorate for Freedom of Information & Security Review
Washington Headquarters Services
Department of Defense


To Whom It May Concern,


I am interested in obtaining copies of two reports about Iraq's oil industry prepared in the months before the Iraqi war began. My request is under the Freedom of Information Act, as amended.
   The first report, said to be about 50 pages in length, was prepared by an outsider, Amy Myers Jaffe, of the James A. Baker 3rd Institute for Public Policy at Rice University. Her report was done in conjunction with a two day conference held on Nov. 20-21 2002 by the Institute for National Strategic Studies (NDU-INSS.). Among the officials knowledgeable about her report is Joseph Collins, the deputy assistant secretary of defense for stability operations.
   The second report was prepared by the Energy Infrastructure Planning Group (EIPG), which was headed by Michael Mobbs, a special advisor to Douglas Feith, the under secretary of defense for policy. The report came in the form of a book, according to Philip Carroll, a former business executive who advised the EIPG.
   If one of these reports, or portions of either of them, are available for release before the full report or reports can be released I would like the partial release as soon as possible.
   I expect a reply to my request within the time frame specified by statute or regulation. I am a reporter with the New York Times and this material will be used in conjunction with journalistic activities. If any rights are afforded to journalistic requests, such as waiver of any copying fees, I would expect to be afforded those rights. I am willing to pay any copying fees or other reasonable and normal charges.
   If material is withheld, or partially redacted, I would like an explanation for such, as provided by law or regulation.
   I can be reached at (202) 862-0345. My fax is (202) 862-0427. My mailing address is c/o New York Times, 1627 Eye St. N.W., Washington D.C. 20006.
   My e-mail address is (jegert@nytimes.com).


Thank you for your assistance,

**dfoisr@dfoisr.whs.mil, 01:01 PM 10/3/2003 -0400, Freedom of Information Act request from news**

Jeff Gerth

# Exhibit C



DEPARTMENT OF DEFENSE
OFFICE OF FREEDOM OF INFORMATION AND SECURITY REVIEW
1155 DEFENSE PENTAGON
WASHINGTON, DC 20301-1155

1 9 NOV 2004

Ref:  04-F-0026(A)

Mr. Jeff Gerth
New York Times
1627 Eye Street, NW
Washington, DC 20006

Dear Mr. Gerth:

This responds to your Freedom of Information Act (FOIA)
appeal of January 30, 2004 and your request of October 3, 2003.

We tasked your request to the Office of the DoD
Representative to the Coalition Provisional Authority, the Office
of the Under Secretary of Defense (Policy), and the National
Defense University (NDU). None of the offices found a record of
the first report you requested. However, NDU provided the
enclosed briefing slides.

Regarding the second document you requested, Mr. Michael H.
Mobbs, Staff Director/Special Advisor to the Under Secretary of
Defense for Policy, an Initial Denial Authority, has determined
that it must be denied pursuant to 5 USC § 552(b)(1) because it
is currently and properly classified by Executive Order 12958, as
amended, Section 1.5(c) which pertains to intelligence sources or
methods. Approximately 500 pages have been withheld.

You have the right to appeal the no records finding and Mr.
Mobbs' decision to deny the classified information. Any such
appeal should offer justification to support another search
effort and/or reversal of the initial denial of the classified
information. Your appeal should be postmarked within 60 calendar
days of the date of this letter, to this Directorate.

Sincerely,

C. J. Talbott
Chief

Enclosure:
As stated



# Exhibit D

To: dfoiasr@dfoiasr.mil
From: Jeff Gerth <jegert@nytimes.com>
Subject: appeal of FOIA denial
Cc:
Bcc:
Attached:

Nov. 16, 2004

Att: C.Y. Talbott,

I would like to appeal your denial of my FOIA request (04-F-0026) and request expedited handling of the appeal. With regards to your denial, dated Nov. 10, 2004 I am only appealing the denial of the second document requested, which, according to your letter, Michael H. Mobbs denied in its entirety.

First let me present my arguments for an expedited appeal. The document I requested, prepared in 2002, pertains to the government's prewar plans for restoring Iraq's oil industry. It is certainly newsworthy to know about the government's plans for Iraq; every day the newspaper is filled with stories about the situation in Iraq. Moreover, the health of Iraq's oil sector is seen as vital to that nation's recovery and the level of US financial and military support. These issues are also newsworthy.   The rebuilding of Iraq, and the adequacy of pre-war planning, was a prominent feature of debate in the recent election. Finally, some critics of the US invasion of Iraq have said oil was a factor in American decision making, a charge that has been denied by officials in Washington. This document will help clarify the issue in an authoritative and newsworthy way. I offer these judgements as a journalist who has spent 25 years in Washington for the New York Times. My final argument for expeditious handling involves what appears to be unnecessary delays in responding to my original request. I noted in my request that Mr. Mobbs was the central figure in this report, yet, according to my conversations with various FOIA officials who handled my FOIA filing, my request was farmed out to the CPA in Iraq, which then went out of business last June. I have notes of my frequent conversations with FOIA officials, spanning many months, which show I was repeatedly told that the reason for the delay was due to officials at the CPA or, after its demise, other units of DOD. If my request had been promptly delivered to Mr. Mobbs he could have acted sooner.

I offer several points to rebut the actual denial by Mr. Mobbs. In the first place, your letter of Nov. 10 does not provide any identifying information about the document I requested, such as its name, author(s) or date. Even the exact length of the document is withheld: instead it is described as "approximately 500 pages." The classification decision by Mr. Mobbs is clearly arbitrary, since not even one word of the document was deemed releasable. On Oct. 5 2003, two days after my FOIA request, the New York Times published a report I wrote that discussed the existence of the requested document as well as some of the material it contained. Prior to publication I interviewed a Pentagon official involved in the preparation of the requested document. That lengthy interview, which was cleared by the DOD's office of public affairs, involved detailed discussion of the requested document. The Pentagon official who was interviewed made clear that parts of the

document in question were based on public, non classified material, such as reports to the UN about the condition of Iraq's oil industry. Not only did the Pentagon authorize this official to discuss the document now being denied, but Pentagon officials tape recorded the discussion. Later, quotations from the interview were forwarded back to a DOD public affairs official via non secure e-mails. The DOD official who received those e-mails and who sat in on the interview (and who presumably taped it as well) is Major Paul Swiergosz. Finally, after the publication of the article, which referenced material from the document and was drawn from the cleared interview, Maj. Swiergosz sent me an e-mail praising the "good job" he said I had done.

So for all these reasons —plus others I may be unaware of due to the fact that I do not have a copy of the requested document — I respectfully appeal the denial by Mr. Mobbs and ask for further review of the document to see whether it, or portions of it, can be released.

I thank you for consideration of my request. I am happy to provide further documentation or elaboration for any of the points contained herein.

Sincerely,

Jeff Gerth
(202) 862-0345

# Exhibit E



**DEPARTMENT OF DEFENSE**
OFFICE OF FREEDOM OF INFORMATION AND SECURITY REVIEW
1155 DEFENSE PENTAGON
WASHINGTON, DC 20301-1155

1 7 DEC 2004

Ref: 04-F-0026(A)

Mr. Jeff Gerth
New York Times
1627 Eye Street, NW
Washington, DC 20006

Dear Mr. Gerth:

This is an interim response to your November 16, 2004, Freedom of Information Act (FOIA) appeal which was received on December 1, 2004.

We have granted your request for expedited processing of your appeal in accordance with procedural requirements in Department of Defense Regulation 5400.7-R, which is available on the Internet at: http://www.defenselink.mil/pubs/foi/. Accordingly, we have moved your appeal ahead of other FOIA appeals, other than those we have also granted expedited processing.

A review of the responsive record is being conducted within the Office of the Secretary of Defense and you will hear from this office in the future concerning the results of the review. The action officer for this case is David Maier, (703) 697-1160.

Sincerely,

C. Y. Talbott
Chief

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| JEFF GERTH | UNITED STATES DEPARTMENT OF DEFENSE |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ___Arlington, Virginia___
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

David A. Schulz
John B. O'Keefe
Levine Sullivan Koch & Schulz LLP
1050 Seventeenth Street, N.W., Suite 800
Washington, D.C. 20036-5514
Telephone: (202) 508-1100

ATTORNEYS (IF KNOWN)

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ● 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

○ **A. Antitrust**

- ☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**        OR        ○ **F. Pro Se General Civil**

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ⊗ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☒ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

---

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Action under Freedom of Information Act, 5 U.S.C. § 552, based on agency's failure to make records available and constructive failure to expedite appeal

---

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** _____ | Check YES only if demanded in complaint |
|---|---|---|---|
| | | **JURY DEMAND:** | YES ☐  NO ☒ |

| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES ☐  NO ☒ | If yes, please complete related case form. |
|---|---|---|---|

**DATE** April 8, 2008    **SIGNATURE OF ATTORNEY OF RECORD**  ✗ _Tim B. O'Neill_

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed _only_ if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the _primary_ cause of action found in your complaint. You may select only _one_ category. You _must_ also select _one_ corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.